**GEORGIA–PACIFIC PLYWOOD COMPANY, Plaintiff,**

v.

**UNITED STATES PLYWOOD CORPORATION, Defendant.**

United States District Court.
S. D. New York.
Oct. 26, 1956.

See, also, 139 F.Supp. 234.

John Vaughan Groner, New York City, for plaintiff. John Vaughan Groner, Charles B. Smith, Fish, Richardson & Neave, New York City, of counsel.

Darby & Darby, New York City, for defendant. Floyd H. Crews, James M. Heilman and Heilman & Heilman, New York City, of counsel.

HERLANDS, District Judge.

The Court will dictate from the bench its opinion, which so far as practicable will contain the specific findings of fact

and conclusions of law. Either party may upon five days' notice submit such additional or supplemental findings of fact and conclusions of law not inconsistent with the decision as such party may consider necessary or appropriate for the purpose of clarifying or implementing the decision.

I shall first take up the findings of fact and, in addition to the specific findings of fact, shall make such comments and observations as may be helpful in explaining the findings and the conclusions where I think explanation is necessary.

As a preliminary, the Court states that it has meticulously examined all of the documentary and physical exhibits and has, in this respect, been greatly aided by outstandingly competent and skillful counsel on both sides.

The Court has also closely observed the demeanor of those witnesses who took the stand. Many of the important issues in this case depend upon credibility. Mindful of the responsibility of a trial court in deciding questions of credibility, I have endeavored very closely to follow every nuance of the testimony as it was given from the witness chair.

Coming to the findings of fact I find as follows:

1. This is an action for a declaratory judgment of invalidity and non-infringement of three patents, referred to in this case as the Deskey patent and two Bailey patents. There are also two counterclaims: one for infringement of the Deskey patent and the other for unfair competition.

The three patents in suit are the following: Deskey No. 2,286,068, filed May 25, 1940, on the application of Donald Deskey, issued on June 9, 1942, to United States Plywood, the defendant herein. William C. Bailey on June 27, 1941 filed an application which on March 6, 1942, was divided. On November 28, 1944, patents Nos. 2,363,492 (Process) and 2,-363,927 (Product) issued to United States Plywood, the defendant herein.

No issue is raised as to the present or past ownership by United States Plywood of those three patents.

This Court has jurisdiction of the parties, the subject matter and the issues raised by the complaint and the answer, including the two counterclaims.

Georgia-Pacific Plywood Company has, since the complaint was filed, changed its name to Georgia-Pacific Corporation. Georgia-Pacific Corporation is a corporation of the State of Georgia licensed to do business in the State of New York, having an office at 270 Park Avenue, New York, N. Y.

2. United States Plywood Corporation is a corporation of the State of New York, having its principal place of business at 55 West 44th Street, New York, N. Y.

3. The Deskey patent will be described in fulsome detail by the Court in the course of this decision and opinion. At this point, and in connection with this finding, the Court states that the Deskey patent relates to a plywood panel in which one or both faces are striated or grooved by a multiplicity of grooves which are made generally parallel with the grain of the wood of the grooved face and which extend entirely over the grooved face. The Court finds that the grooves disclosed and claimed are of uneven size and depth. Panels having both faces grooved are not pertinent to the issues herein. The Deskey claims are not limited to panels of any particular kind of wood.

The Court finds that the primary effect of the grooving is to produce a highly decorative panel of great sales appeal. Another effect of the grooving, incidental to its decorative effect, is to reduce checking and cracking and to reduce edge separation which occurs on plain, ungrooved plywood panels.

4. The two Bailey patents are asserted to be improvements on the Deskey patent. They are in substantial respects identical in specifications, the claims of Bailey 2,363,492 being directed to a process, and those of Bailey 2,363,-

927 directed to the resultant product. Both assert that panels made according to the disclosure of the Deskey patent tended to cup or warp. Bailey aimed at correcting this tendency by employing front and rear plies which originally were unbalanced, that is, of uneven thickness, in such degree that, after the removal of the wood from the front ply as an incident of the grooving, the front and rear plies contained substantially the same amount of wood; and thus the panel became balanced.

5. The defendant, United States Plywood, has charged the plaintiff with infringement of the two Bailey patents; and this Court, therefore, has jurisdiction of the Bailey patents.

6. Long prior to Deskey, the exposed face of lumber, shakes and shingles, plywood and other related wood products had been grooved in a way fundamentally indistinguishable (in kind and in principle) from the grooving disclosed, with reference to plywood panels, by Deskey.

Examples of these prior practices are shown in what has been called in this trial the Craft-Putman-Melby prior use, and in the following patents which issued to those three men:

Putman—1,577,150, of 1926 (Plaintiff's Exhibit 1, tab 2);

Melby—1,634,789, of 1927 (Plaintiff's Exhibit 1, tab 4);

Melby—1,764,412, of 1930 (Plaintiff's Exhibit 1, tab 5);

Putman—1,780,097, of 1930 (Plaintiff's Exhibit 1, tab 7);

Craft—1,820,445, of 1931 (Plaintiff's Exhibit 1, tab 9);

Putman (Canadian)—302,038, of 1930 (Plaintiff's Exhibit 1, tab 18).

Other examples of similar or analogous grooving of wood products are shown in the following patents:

Morden—1,773,695, of 1930 (Plaintiff's Exhibit 1, tab 6);

Gilmer—1,910,895, of 1933 (Plaintiff's Exhibit 1, tab 10);

Gilmer—1,943,597, of 1934 (Plaintiff's Exhibit 1, tab 11);

Gram—2,090,529, of 1937 (Plaintiff's Exhibit 1, tab 13);

Maurer—2,202,109, of 1940 (Plaintiff's Exhibit 1, tab 14);

Maurer—2,202,110, of 1940 (Plaintiff's Exhibit 1, tab 15);

Maurer—2,244,426, of 1941 (Plaintiff's Exhibit 1, tab 17).

While the first two Maurer patents issued on May 28, 1940 (three days after the Deskey application had been filed), they were filed respectively on December 1, 1937 and June 1, 1938. Maurer No. 2,244,426 was filed in the United States on November 13, 1939, but it is entitled to a Canadian filing date of December 17, 1938.

7. In the period from 1923 to 1926, Charles Putman and Dale Craft produced a machine which grooved the face surface of shingles in simulation of hand-split shakes (Plaintiff's Exhibit 2, pp. 57, 154).

In 1927 Charles J. Melby became associated with them. Thereafter grooved face shingles or imitation shakes were produced on a planer, the knives of which had serrated cutting faces. Substantially all grooved wood products made since that time (including the grooved plywood made by defendant under the Deskey and Bailey patents, and that made by plaintiff, and here accused) are similarly made on planers, the knives of which are serrated.

The Craft-Putman-Melby imitation shakes have continued to be widely sold up to the present date (Plaintiff's Exhibit 2, pp. 31–34, 79, 81–82, 158).

The manufacture of these imitation shakes suggested the extension of the idea to lumber, one face of which was grooved for use as interior paneling (Plaintiff's Exhibit 2, pp. 164–165, pp.) 64, 100–101. This in turn suggested the grooving of plywood (Plaintiff's Exhibit 2, p. 308). All of these similar operations were performed in the same way on the same sort of machine (Plaintiff's Exhibit 2, pp. 102 and 103, 185).

This natural development or progression is only what is to be expected of anyone ordinarily familar with the manufacture and utilization of wood products. This development and progression contained no attribute or element of invention.

The Bishop home built in 1928 at Hood's Canal, Washington, still has the paneling which originally was installed throughout (Plaintiff's Exhibit 2, sub-exhibits M–2A through F).

In 1928 Craft-Putman-Melby granted the right to manufacture and sell grooved lumber to the E. C. Miller Lumber Company which from that date to the present has continued to make and sell such lumber (Plaintiff's Exhibit 2, pp. 103–104, 185–186, 199).

The contract with Miller significantly excluded from the terms of the grant the right, among other things, to make or sell "veneer and/or plywoods * * * so processed" (Plaintiff's Exhibit 2, sub-exhibit M–9, paragraph 1). This exclusionary phrase was interlineated in the typed contract in longhand.

Having reserved to themselves the right to make grooved plywood, Melby proceeded to its manufacture; Putman acted as his sales agent (Plaintiff's Exhibit 2, pp. 325, 326, 340–341, 192, 272, 189, 197, 279). Such plywood was installed and is still used as paneling in a home built by the American Legion in Everett, Washington (now the home of P. Unkeles), in the office of Royal Shingle Company at Whites, Washington (now the home of K. Luken), was used in the storefronts of a building (now destroyed) in Everett, Washington, and samples were made up for use by Putman (Plaintiff's Exhibit 2, pp. 72–74, 189–193, 197, 235–242, 250–252, 279, 311–312, sub-exhibits E–24A through C and sub-exhibits M–6A through D; Defendant's Exhibits 18 and 19).

The depression intervened. The lumber industry was prostrated, with a resultant inability to sell any but the most common or essential products. Melby failed in business (Plaintiff's Exhibit 2, pp. 172, 174, 197–200, 296–298, 315, 318). Consequently manufacture by Melby of the grooved plywood ceased (Plaintiff's Exhibit 2, pages 296–298, 311, 315).

8. The grooved plywood manufactured by Melby (and called Moray) has approximately 16 grooves and ridges to the inch; each groove is of the same depth; each ridge is of the same height; they are entirely uniform in profile.

At this point, the Court states that reference will be made in considerable detail to Melby's Moray plywood. Samples of this plywood have been closely scrutinized and analyzed by the Court. The Court also has available and has closely examined a series of photographs, eleven in number, which have been marked and received as Plaintiff's Exhibit 20. These photographs, which will also be referred to in some detail in the course of this decision, elucidate and make clear beyond peradventure of doubt the details which are set forth in this and the subsequent findings of fact and conclusions of law. I refer specifically to the physical characteristics of the grooved lumber, the shakes and shingles, the Moray plywood, the various products involved in the California litigation before District Judge Hall (which has been referred to here as the Zeesman litigation); and I refer specifically to the commodities known as Combwood, Venetex and Zeetex.

It is also appropriate at this point to comment that the Court has seen in demonstration a measuring device which, in actual courtroom demonstration, measured to the thousandth of an inch. The defendant's experts conceded the accuracy of this dial measuring device, which has an indicator manufactured by Federal Products Corporation, Providence, Rhode Island, Model CB1, with a calibration indicated thereon to the thousandth of an inch.

The record is replete with lineal measurements made by this device; and the Court is entirely satisfied beyond a shadow of any doubt that the physical characteristics of the wood surfaces of plywood, lumber, shingles and shakes and

other wood products can be measured to at least a tolerance of .001 of an inch; that in addition to the device referred to, there is readily available to the technicians who are employed in this industry micrometers also furnishing lineal and profile and other measurements to a tolerance of .001 of an inch.

Significant also is the state of technology in this industry. The literature both industrial, academic and governmental, demonstrates beyond cavil that this is a classic illustration of the joint efforts of industry, science and research, and that the learning in the field, the art of the craft, the literature on the subject customarily speaks in terms of precise percentages and lineal measurements. It is an industry in which the scientist and the businessman have joined hands; and they speak a common language, a language which was available to Deskey and Bailey and which they could have readily used to give a precise description, specification and definition to their alleged inventions. As will hereafter be pointed out, they failed to utilize such readily available language, terminology, nomenclature and measurements.

9. The Deskey patent asserts that the primary purpose of its grooving is to relieve stresses in its exposed surface, that is, the surface of the plywood, and thus to prevent expansion or contraction of the plywood panel and the formation of checks. Checks are very small hairline cracks in the surface. Craft-Putman-Melby grooved their imitation shakes, their lumber and their plywood solely for decorative purposes. The grooving of any wood surface is primarily for decorative purposes, though they may serve other and incidental purposes. The grooves, in any such case, serve the incidental purpose of masking any cracks between adjacent shakes or boards or panels. Similarly, they tend to retard and also to mask checks. To some degree, dependent upon the depth and frequency of the grooves, grooves relieve surface tensions and retard expansion or contraction due to moisture change; and thus they inhibit the formation of checks. The foregoing effects of grooving are true in kind and in principle in grooved imitation shakes, in grooved lumber and in grooved plywood, including Melby's Moray plywood. As indicated and as clearly demonstrated to the Court's satisfaction, the difference in such effects are differences in degree and not in kind or nature.

10. Since the Craft-Putman-Melby imitation shakes, lumber and plywood had the foregoing effects (in addition to decoration), it is without controlling legal significance that such effects (other than decorative) were not recognized by Craft-Putman-Melby or may not have been recognized by them. Beyond this it was recognized and taught in the Hansen patent No. 1,433,077 of 1922 (Plaintiff's Exhibit 1, tab 1) and the Elmendorf patents Nos. 1,819,775 (Plaintiff's Exhibit 1, tab 8) and 2,018,712 (Plaintiff's Exhibit 1, tab 12) of 1931 and 1935 that the splitting or slitting of a wood veneer (and it may be observed that the face ply of a plywood panel is a wood veneer) relieves surface tensions and retards warping. More importantly, however, Gilmer in his patent No. 1,910,895 of 1933 (Plaintiff's Exhibit 1, tab 10) specifically taught that a grooved shingle "will not check nor warp as readily [as an ungrooved one] due to the longitudinal flutings affording a greatly increased dispersion of the shrinking and expansion strains." The Court finds that this is precisely what Deskey, eight years later, assumed to teach. The fact that Gilmer directed his teaching to a grooved *shingle* and that Deskey directed his teaching to a grooved *plywood panel* is without controlling legal significance because each did the same thing in the same way for the same primary purpose.

11. Melby's Moray plywood was abandoned; but a close and careful scrutiny and analysis of the record has convinced the Court that it was not an abandoned experiment. It was instead a completed, finished article, the manufacture and continued sale of which was abandoned solely because of the depression (Plaintiff's Exhibit 2, pp. 172, 174, 197–200, 296–298, 315, 318). It may be analogized to

the DTG of Kratz in the Corona case, Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 369, 378, 385, 48 S. Ct. 380, 72 L.Ed. 610. It is unlike Cartwright's abandoned experiment with coated lenses in the Bausch & Lomb case, Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, 534, certiorari denied 350 U.S. 955, 76 S.Ct. 341.

12. As has already been noted the Deskey patent applied to all kinds of wood and not only to Douglas fir.

12a. Cracking, checking and panel edge separation constitute problems in the wood industry. Such problems are carried over from wood in general to plywood in particular; and they are somewhat intensified when plywood is made of soft wood such as Douglas fir. However, the problems of cracking, checking and paneled edge separation have not represented and do not represent the overshadowing or dominant or primary problems of the plywood manufacturing industry.

The great success of grooved plywood in much of its interior use is attributable to its decorative appearance, especially when the panels are stained or painted or given special surface effects.

Plain plywood as distinguished from grooved plywood has been and still continues to be a major source of income derived from the many uses of plain plywood where its strength and utility are the desired features and where esthetic qualities are not the desideratum.

To the extent that statistical data may be extracted from the experience of the industry and as testified to at the trial, it indicates that the problem of plywood surface checking measured by such objective terms as customers' complaints is of relatively minor, if not minuscule, significance.

Facile generalizations presented by defendant's witnesses concerning the alleged acuteness of the problem of plywood surface checking just do not stand up under searching scrutiny or objective facts.

In reality, checking cannot be completly eliminated. A discussion of checking would be helpful, for it furnishes much of the technical background necessary for a complete understanding of the issues in this case and the Court's decision in regard to them. Of greater and more controlling significance in this litigation is the clearly demonstrated fact that checking is an uncertain and unpredictable phenomenon.

Wood is a complicated organic substance. Its chemistry is complex. Indeed wood occupies a special place in the field of industrial, academic and governmental chemical research. But in spite of the complexity of the subject and its many ramifications, it is clear that checking depends upon such variables as:

a. The botanical species of the wood.

b. The geographical location of the place of growth of the wood.

c. The method of lathing.

d. The moisture content of the wood plies during the process of manufacture.

e. The type of glue used to join the veneers and layers or lamina.

f. The type of press used.

g. The coarseness or closeness of the graining, which varies from species to species and from tree to tree within the same species.

h. The cut of the wood, such as, with or across the grain.

i. The climatic conditions under which the timber grew.

j. The resultant composition of hard (summer, winter and fall) versus soft (spring) growth in the very same piece of lumber or wood.

k. The humidity and temperature to which the wood in its final or manufactured state is eventually exposed and used by the consumer.

l. The use (interior or exterior) to which the wood is put.

With so many variables to be accounted for, it is necessary to be wary of oversimplified generalizations, whether they are contained in a patent application or in courtroom testimony.

The problem of checking can be and has been met to a large, if not complete-

ly satisfactory, extent by the use of chemical treatments either before, during or after manufacture, such as, water-repellents, paint, varnish, stains, primers, fillers, and better manufacturing conditions. See for example Batey's Report of August 10, 1955 (Defendant's Exhibit Q).

Defendant's own advertising of Firzite, a wood sealer, sold by defendant, illustrates the above point for defendant represents that its Firzite seals the pores, subdues the wild grain, and virtually eliminates checking and grain raising (Plaintiff's Exhibit 2, sub-Exhibit NY–31D, page 28). Moreover, defendant repeatedly advertises some of its nonstriated wood as crackless or crack-proof and permanent. (Plaintiff's Exhibit 2, sub-Exhibit NY–31A and B.) Defendant appears to recommend treatment for all its paneling (Plaintiff's Exhibit 2, sub-Exhibit Plaintiff's Deposition pp. 562–563) including not only that which is not striated but that which is as well (Plaintiff's Exhibit 2, sub-Exhibits NY–31D, page 28, NY–31F).

Accordingly, the Court does not accept defendant's contention that Deskey's patent is valid because he discovered a necessary panacea for cracking, checking and edge separation in plywood.

■ 12b. Invention is the exception to evolution just as genius is the exception to genus. There is here absent that flash of inspiration, that sudden insight, that creative imagination which lie at the heart of real discovery.

■ The law distinguishes between the patient investigator, the master mechanic and the skilled artisan and, on the other hand, the inventor. Deskey simply transposed grooving from one wood product to another—from lumber, shakes, singles and even Moray grooved plywood to defendant's plywood.

It is utterly immaterial that Deskey may not have actually known of the prior art. "The law unsparingly charges him with an acquaintance with all the earlier developments of the art." Judge Learned Hand in Foxboro Co. v. Taylor Instrument Company, 2 Cir., 1946, 157 F.2d 226, 233. What Judge Hand said about Mason, the inventor in the Foxboro case, may be said about Deskey:

"So far as he is concerned, his work is merely the latest refinement of a continuous progress, proceeding by trial and error."

The evidence demonstrates most convincingly that the Deskey and Bailey patents merely carried forward and extensively applied the pre-existing original idea of grooving wood and wood products.

■■ It is well settled that a mere change in degree, form, proportions or size in existing means does not rise to the level of invention. In the present case, Deskey and Bailey distinguished over the prior art not in kind but only in a matter of degree. While a change in degree may be a commercial improvement, it is not patentable invention. See Martin v. Seligman, D.C.S.D.N.Y.1954, 119 F.Supp. 258, 260; Johnson v. Henricks, 2 Cir., 1944, 140 F.2d 108, 109; Myerson v. Dentists' Supply Co., D.C., 66 F.Supp. 31, 39, affirmed 2 Cir., 1947, 159 F.2d 681, 682; Helene Curtis Industries, Inc., v. Sales Affiliates, Inc., D.C.S.D.N.Y. 1954, 121 F.Supp. 490, 498, affirmed 2 Cir., 1956, 233 F.2d 148, 152, certiorari denied, 1956, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80. Wilson Athletic Goods Mfg. Co. v. Kennedy Sporting Goods Mfg. Co., D.C.N.D.N.Y.1955, 133 F.Supp. 469, 471–472, affirmed 2 Cir., 1956, 233 F.2d 280.

In Application of Patton, Cust. & Pat. App.1956, 234 F.2d 499, which is cited merely because it is a very recent example of the thinking of the courts, it was held that patent claims relating to methods of imparting a simulated wood grain on construction board made from bound sawdust were properly rejected as being unpatentable over the prior art which applied an ornamental grain pattern on natural wood. At page 502, Acting Chief Judge Johnson said:

"It was held at an early date, and we still believe it to be sound law, that the application of an old proc-

ess or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated. Pennsylvania Railroad Co. v. Locomotive Engine Safety Truck Co., 1883, 110 U.S. 490, 494, 4 S.Ct. 220, 28 L.Ed. 222; Ansonia Brass & Copper Co. v. Electrical Supply Co., 1891, 144 U.S. 11, 18, 12 S.Ct. 601, 36 L.Ed. 327; In re La Verne, 229 F.2d 470, 43 C.C.P.A., Patents, 767".

12c. It is the conclusion of this Court that the differences between the subject matter covered by the Deskey and Bailey patents and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the Deskey and Bailey subject matter pertained. Deskey and Bailey did not themselves invent the subject matter covered by their patents. Thus, the invalidity is based upon the lack of invention and lack of patentable novelty.

As has been indicated, there is convincing evidence in the record before the Court that the grooving of wood surfaces, and in particular plywood face surfaces, was and is closely analogous, if not part and parcel of a single art. The prior patents taught that the treatment of wood surfaces would tend to retard checking; and thus the Deskey and Bailey claims lack patentable invention, as indicated, over the prior art disclosures mentioned above.

To elaborate, the prior art of woodworking taught the ordinary skilled artisan of the craft grooving, fluting, striating, incising, carving of wood surfaces— and that there was a therapeutic relation between such treatments of wood surfaces and such phenomena as checking, cracking, warping and wood preservation. Some of the analogies contained in the prior art are more direct and significant than others, but the total body of the prior art taught the subject matter covered by the Deskey and Bailey patents.

13. In view of the work of Craft-Putman-Melby in making and selling grooved shingles, lumber and plywood, the Court has concluded that it is not invention to groove plywood as disclosed and claimed in the Deskey patent. For such reason, independently of the other reasons set forth in this opinion, the Deskey patent is invalid.

14. Melby's Moray plywood anticipates the Deskey patent. For such reason, the Deskey patent is invalid. The anticipating effect of Moray plywood is highlighted and made unmistakably clear by the action of United States Plywood in earlier litigation. United States Plywood Corp. v. Zeesman Plywood Corp., D.C.S.D.Cal.1949, 84 F.Supp. 78 and D.C. S.D.Cal.1950, 92 F.Supp. 336.

In the California litigation, it was asserted that Combwood, a plywood made by one of the defendants in that litigation, was an infringement of Deskey. The Court, in this case, has meticulously examined and compared Combwood and Melby's Moray plywood. One example of Combwood is exemplified by Defendant's Exhibit DD-16, formerly known as Defendant's Exhibit 37B. This Combwood is photographed in one of the photos comprising Plaintiff's Exhibit 20. Melby's Moray plywood is exemplified by two exhibits in the case on trial, Defendant's Exhibit Y, which is original Moray plywood, and Plaintiff's Exhibit 2, sub-exhibit E-27, which is a later specimen of Moray plywood. These two Moray plywood specimens are photographed; and the photographs are contained in Plaintiff's Exhibit 20.

Also in connection with the California litigation, it is well to note that Defendant's Exhibit II is an example of grooved plywood known as Zeetex and Defendant's Exhibit JJ is an example of Venetex. Both Zeetex and Venetex have been photographed; and the pictures are a part of Plaintiff's Exhibit 20 in the case at bar.

As previously indicated and stated, it was asserted in California that Comb-

wood was an infringement of Deskey. Upon a complete examination of the entire record before me, I have concluded and find that Combwood and Melby's Moray plywood are patentably indistinguishable. To the extent that there are differences, Moray plywood is closer to Deskey than Combwood.

In the consent decree entered in the California litigation, the Court, at the instance of United States Plywood, held Combwood to be an infringement (Plaintiff's Exhibit 2, sub-exhibit NY–33, paragraphs 31–34 and conclusions 2, 5 and 13). I shall have more to say about the California litigation in the course of this opinion.

■ It is axiomatic in patent law that that which infringes if later, anticipates if earlier. Since Moray was earlier it anticipated Deskey.

The defendant, United States Plywood, cannot now be heard to take a position directly contrary to that it previously has maintained in the California litigation and by which it has profited in the past.

■ 15. The grooved shingle of Gilmer No. 1,910,895 (Plaintiff's Exhibit 1, tab 10), of 1933, is substantially indistinguishable from that of Craft-Putman-Melby. It specifically taught that grooving relieved strains and prevented checking or warping and, as already pointed out by the Court, it is not invention to accomplish an old purpose in an old way on an intimately related product. For this reason, the Deskey patent is invalid.

16. Morden patent No. 1,773,695 (Plaintiff's Exhibit 1, tab 6), of 1930, disclosed a composite board having grooves on its exposed face for the purpose of masking cracks between adjacent boards. The Morden composite board was used, like Deskey grooved plywood, for paneling. It is not invention to do to plywood what Morden already had done to composite board, a very closely related wood product.

17. Maurer patent No. 2,244,426 (Plaintiff's Exhibit 1, tab 17), of 1941, followed a number of earlier Maurer patents relating to the same subject matter. It disclosed a machine "for incising or indenting the surfaces of laminated wood panels and the like." While there has been a question raised in this case as to whether or not plywood panels technically constitute laminated wood panels, the Court finds that within the context and meaning of Maurer patent No. 2,244,426 the term "laminated wood panels" was used in a generic sense and was used broadly enough to encompass plywood panels. The state of the art of plywood at the time Maurer filed his patent, in the Court's opinion, was not sufficiently advanced and refined to make the distinction suggested by one of the defendant's witnesses, that laminated wood means wood in which the layers all run in the same direction in contrast to plywood in which the middle core graining is at right angles to the graining of the face and back plies. In any event, this battle of terminology as to whether or not plywood is a laminated wood is of no material significance in the fundamental resolution of the question presented by the prior art, including specifically the Maurer patent under discussion.

In that patent, one form of the machine disclosed that the die carrier was provided with "sufficient annular icising members"—that is, groove cutters or formers—"to incise material of the full width of the table." A plywood panel so incised would be patentably indistinguishable from the panel of the Deskey patent. The Deskey patent, for that reason, is invalid.

The witnesses called by the defense admitted, with varying degrees of candor, that grooving or striating the surface of wood tended to prevent or retard cracking, the retarding or deterring effect depending upon the variables previously itemized.

A study of the eleven photographs which comprise Plaintiff's Exhibit 20 is a graphically persuasive demonstration that what Deskey did involved merely changes in the depth and arrangement of the grooves. In material respects it

is difficult to distinguish defendant's product from the other products photographed in Plaintiff's Exhibit 20.

██ In the California litigation Zeetex, Venetex and Combwood were held to be infringing articles or products. If, thus, Combwood, Venetex and Zeetex may be taken as samples or examples of infringing products, by a parity of reasoning they should serve as samples or examples of what earlier art might constitute anticipation or, at least, the relevant teaching of the art. The defendant has been caught on the horns of a dilemma. For when it suited its purposes to charge a product to be an infringing product, it did not hesitate to do so, but when it suits its purposes to take a different position it retreats from the other. The Court, of course, will not tolerate such weathervane arguments which shift with the winds of necessity.

We now come to the question of definiteness or indefiniteness; and it is necessary at this point to consider the Deskey patent in some detail.

18. It is also necessary to consider the patent history of the Deskey patent. The file history is Defendant's Exhibit T.

██ The Deskey patent, as issued, contains two figures. Originally there were three figures, but the third figure was either stricken out or withdrawn. It is elementary learning that patent application diagrams and drawings, such as exemplified by Figs. 1 and 2, are not scale drawings; they are not working blueprints or plans. They serve only to illustrate the essential principles of the patent, unless it is affirmatively stated that they are precise drawings.

The defendant in this case has argued, and the Court believes erroneously, that by reference to the stud, element 9 on Fig. 1, it is possible to derive a unit of measurement, that is, using the standard width of a stud to scale off the related linear measurements of the sections of the plywood resting on the stud. The Court rejects the suggestion as being fanciful. Moreover, Fig. 1 and Fig. 2 are different from each other in many respects. Moreover, the specification itself, page 1, column 2, line 33, simply refers to the stud as an illustrative support.

The drawings, then, do not serve the function of precise measurement. They furnish no basis for determining critical limits. According to the drawings all of the grooves (and I emphasize the word "all") are of random depth. Neither one of the drawings shows grooves of uniform depth. This becomes important in interpreting claim 2 of the patent. Moreover, as was testified to upon the trial, the profile or outline showing the configuration of the grooves and ridges on Fig. 1 and Fig. 2 are different from each other, so that it is utterly impossible by the most assiduous study of Figs. 1 and 2 to determine the essential configuration or interrelationships of lengths, widths, depths and spacings of grooves and ridges which constitute the alleged discovery of Deskey.

We then turn to a consideration of the written specification to determine whether the darkness engendered by the drawings is dissipated by the light of the specification. In view of the great importance of this case to the parties involved, to the industry as a whole, and to the public, the Court deems it advisable to present a rather close consideration of the Deskey specification. The Court desires to state, in this connection, that it has read and studied a number of times the file history showing the genesis and evolution of the language of the patent application.

It may be footnoted at this point that all of the claims, as originally submitted, were rejected. Then began that process of attrition by which patent examiners are sometimes worn down until finally the patent application is approved.

Because defendant's key expert witness was Dr. Grondal it is most appropriate to point out that Dr. Grondal was associated with this patent, if not from the moment of its conception, at least from the moment of its delivery, participating indeed in the very process of getting the Patent Office to give its blessings to this newborn arrival. After the claims were

rejected, Dr. Grondal was retained by defendant's patent solicitors to conduct various tests. His role in the matter is indicated in the letter of April 20, 1948, written by one of defendant's patent attorneys to Dr. Grondal (Plaintiff's Exhibit 2, sub-exhibit NY-37A), the first paragraph of which reads as follows:

"In approximately 1941 you made some tests at the request of Mr. Charles Reynolds for the United States Plywood Corporation on grooved plywood material which we call Weldtex. The purpose of the tests, and the subsequent report, was in order to convince the Patent Office of the patentability of the idea" (trial record SM pp. 1361–1362).

The Court will have more to say about Dr. Grondal's tests and his report when we come to a consideration of Defendant's Exhibit T, the file history. After the Patent Office rejected all of the Deskey claims as originally submitted, Dr. Grondal submitted a report which is contained at pages 21 to 41 of the file history, Defendant's Exhibit T.

In Dr. Grondal's affidavit, sworn to July 23, 1941 (set forth at pages 19 to 20 of the file history, Defendant's Exhibit T), Dr. Grondal states that he conducted the tests reported upon by him during the period from April 30 to July 10, 1941. The caption of the affidavit reads:

"In the application of Donald Deskey for an improvement in plywood panels and processes, serial No. 337,-219, filed May 25, 1940."

It is difficult to believe that Dr. Grondal did not note the name of Donald Deskey. Upon the trial, he admitted that he knew that the report and the tests discussed therein were conducted and reported upon in connection with the patent application, but he seemed to indicate that the name Donald Deskey did not mean anything to him. He also stated that at no time did he know that the Deskey claims, as originally submitted, had been rejected.

I believe that Dr. Grondal's memory has failed him in this respect. It is dif-

ficult for the Court to conceive that a patent application, whose claims had been rejected in their entirety, would not have been called to his attention in one way or another—innocently so, and in accordance with the most sensitive ethical standards—by the patent solicitors who engaged Dr. Grondal to conduct research, the results of which, as reported upon, were used to support the application.

The Court is of the view that Dr. Grondal has had rather long and intimate relations with United States Plywood, going back, as indicated, to the early days of the Deskey patent. There is no need to go into the rather unfortunate incident in the Zeesman litigation, where Dr. Grondal was subpoenaed by the Zeesman interests and there was no full and frank disclosure of the fact that he had been in active correspondence with the other side concerning the same litigation and that Dr. Grondal had stated, in his letter to United States Plywood, that he would sustain or endeavor to sustain his report in a very positive manner.

The Court expresses no opinion as to the ethics involved, but simply refers to the incident as indicating a rather close relationship between Dr. Grondal and United States Plywood. He received an honorarium of $100 in the Zeesman litigation, which has been colloquially characterized by one of the then United States Plywood's attorneys as cigarette money.

In any event, Dr. Grondal was placed in the rather unenviable position, in the case on trial, of again testifying in a litigation in which the Deskey patent—which indirectly may be considered as having received the blessings of Dr. Grondal's research work—was again under attack. He thus was obviously placed in the position of sustaining and supporting a patent which the file history shows had been issued almost entirely upon his report. Consciously or unconsciously, Dr. Grondal was engaged in a conflict of interests, intellectually speaking at least, in which his neutrality and non-partisanship as a scientific worker were subject

to the tremendous pressures and exigencies of the litigation. It is unfortunate that he found himself in that position; and it was only under relentless cross examination that he was driven to make admissions and statements of facts, which facts were obvious to the Court on the basis of all of the other testimony in the case.

This bears on the vital issue of indefiniteness, which I shall now proceed to take up by reverting to a consideration of the Deskey patent as issued.

Page 1, column 1 of the Deskey patent reads as follows, at lines 49 et seq.:

"I have found it possible to eliminate these stresses, and the deleterious effects thereof, by gouging the surface or surfaces of the panel with a multitude of closely spaced grooves, extending generally parallel to the grain, and preferably of uneven, irregular, and random depth, following no recurring pattern, but sufficiently closely spaced, and having, at sufficiently close intervals, sufficient depth as to cut through the recurring grain layers, and to break up each individual layer and the surface of the panel generally into narrow widths or ribs of uncut wood. Within these narrow widths the stresses which cause the shrinking, cracking, checking, and swelling may not accumulate to such an extent that they may not be relieved within the grooves in the surface."

It will be noted that the following words are used:

"a multitude"—This is nowhere defined.

"closely spaced grooves"—What is closely spaced is nowhere defined.

"uneven, irregular, and random depth" —Nowhere are these terms defined.

"no recurring pattern"—These words emphasize the casualness and chance character of the irregularity and randomness of the grooves.

"sufficiently closely spaced"—This is nowhere defined.

"having at sufficiently close intervals" —These words are nowhere defined.

"sufficient depth"—These words are nowhere defined.

"as to cut through the recurring grain layers, and to break up each individual layer * * *" (italics added)— This is a description in terms of function and result but without objective measurement or limits.

"to break up * * * the surface of the panel generally into narrow widths or ribs of uncut wood"—Nowhere are the narrow widths defined.

"within these narrow widths"—Again narrow widths is nowhere defined.

"within these narrow widths the stresses which cause the shrinking, cracking, checking, and swelling may not accumulate"—This refers to the stresses which are sought to be eliminated and is a statement in terms of function and result.

"may not accumulate to such an extent"—This is nowhere defined and, again, is an extension of the idea of function and result.

"to such an extent that they may not be relieved within the grooves in the surface"—This is a statement purely and simply in terms of function and result.

The foregoing language is a sample of the labyrinthine verbalism of this patent.

I continue with the description and analysis of the patent application and specification.

Page 1, column 2, line 11, et seq. states:

"Accompanying this application is a sample of a piece of plywood, thus grooved, and photographs showing such a panel before grooving and after grooving."

The sample of the piece of plywood apparently is not available. The photographs are filed in Washington and are not part of the printed patent application that is available to the public unless one were to make a file search. The photographs in the file history serve no practical purpose in elucidating the foregoing description, for apparently—even

according to the defendant's own contention—the criticality of invention depends upon very minute changes in the physical characteristics of the groovings.

The specification continues, at page 1, column 2, line 15, et seq.:

"The accompanying drawing attempts to illustrate the appearance of the panels, and the manner in which the objectives are attained."

The Court has already referred to Figs. 1 and 2 and it is obvious in view of the criticism of Figs. 1 and 2 that they do not throw light on the problem. Moreover, the specification expressly states that they are illustrative and not by way of limitation. The drawings or figures attempt to illustrate the appearance of the panels, and even in that respect they are most inadequate, for the testimony at the trial demonstrated that the defendant's Weldtex product in its groovings and characteristics thereof did not substantially approximate the drawings. Moreover, the above language states that the figures are designed to "illustrate" the manner in which the objectives are attained. We thus have a drawing which is merely illustrative of the manner in which the objectives are attained but the drawing is completely lacking in all essential, vital and critical information.

Thus far the Court notes a complete absence of any objective measurements, an absence which is conspicuous throughout the entire patent application both in its specification and claims. Read as you will the black letters of the application or between the lines, one cannot devise any formula, recipe, formulation, configuration or any other substantially precise or substantially accurate or substantially useful measurements of this invention.

Dr. Schrader, one of the defendant's witnesses, testified that the main desideratum, the main criterion in determining whether or not some other grooved plywood came within or without the Deskey patent was the results achieved. That too is the inexorable inference from Dr. Grondal's testimony, which the Court will discuss in greater detail in the course of its decision. The absence of ratios, percentages, proportions or any other measurements under any system of measurement is aggravated by the fact that the state of the art, as previously pointed out by the Court, does permit of precise and accurate measurement. And hence this is not a case where the applicant was faced with a poverty of language or with language which did not lend itself to that preciseness and definiteness which are prerequisites under the patent laws, both by statute and by judicial interpretation.

Returning then to the Deskey patent, we find the following, page 1, column 2, lines 46 et seq.:

"The grooves need not conform, in cross-section, to any particular form, but may be V-shaped, rounded, or individually of different contours."

Here again, there is a complete absence of precision. In fact, it is just the antithesis of precision.

Deskey states that the grooves may be formed in various ways "preferably by planar knives having irregularly serrated cutting edges" (page 1, column 2, lines 43 et seq.). This is a clear and distinct echo of the prior art previously discussed.

On page 2, column 1, line 10 et seq. Deskey indicates an acquaintanceship with the prior art for he states:

"This grooving is to be distinguished particularly from grooving, *as heretofore practiced,* in patterns or groups of grooves, for purely visual effect. The grooving according to this invention is usually distinguished by an absence of any pattern." (Italics added).

Further, on page 2, column 1, line 23 et seq. he distinguishes between the absence of pattern in his invention and "the patterned grooving" of the prior art.

Thus, we have Deskey stating, in so many words, that he disclaims any pattern to his grooving, a disclaimer which becomes important in the light of the fact that the defendant in this case claims that plaintiff has unfairly com-

peted with the defendant by imitating its pattern. The Court finds that the distinction attempted to be made by Deskey is self-serving and was an artificial and unsuccessful attempt to distinguish his alleged invention from the prior art; for, as already stated, the grooving achieves the primary, fundamental and principal practical result of making plywood attractive and decorative. Obviously, Deskey could not have attempted to get a patent by simply increasing the decorative value of plain plywood. And so the Court regards the language in regard to the remedy for checking et cetera, et cetera, as an artful attempt to convince the Patent Office of novelty and genuine invention—especially after the original claims had been rejected and only after that did Dr. Grondal come up with the scientific data which purportedly established the basis for the Deskey statements.

In discussing the matter of pattern, it should be stated that at page 2, column 1, line 35, Deskey did admit the possibility that "a patterned effect" may be desired and that it could still come within his invention provided "the grooves are closely enough spaced, and sufficiently deep, to break up the continuity of the surface laterally, and to adequately groove the edge areas." Here again, we are confronted with language which speaks in terms of function and result achieved. Completely absent are any objective definitions and measurements.

The Deskey patent continues, page 2, column 1, lines 41 et seq.:

"The essential of this invention is that the grooves are of such depth, relative to the thickness of the face ply, and are closely enough spaced, that the ribs are of slight width, and the stresses in the gouged surface areas of the face ply are relieved, and cannot accumulate to any appreciable extent. Preferably the grooves do not extend to or through the glue line * * * but more or less frequently recurring grooves may extend almost to the glue line, with intervening grooves of *lesser*

*and irregular depth. The grooves vary in depth,* as the sample and photographs show, from mere surface scratches to grooves of a depth to extend to or past the neutral plane of the grooved face ply (halfway through the ply), some being of a depth approaching the thickness of the ply itself." (Italics added.)

It will be noted that, in describing the essential of the invention, the grooves have random depth. It will be noted that Figs. 1 and 2 describe grooves of random depth. It will be noted that, according to Deskey himself, the very sample and photographs submitted by him to the Patent Office show grooves of random depth.

The foregoing comments are of special significance in interpreting the scope and coverage of claim 2 of the patent.

I continue with an analysis of the Deskey specification. Page 2, column 1, 68 et seq., reads:

"* * * if there are sufficiently deep grooves, sufficiently closely spaced, the cumulative build-up of lateral stresses to an excessive value is very effectively prevented."

The word "sufficiently" used in the above quoted excerpt may be taken as symbolic of the amorphous, hazy, nebulous and obscure character of all of the other descriptive words in this patent. It is clearly a description in terms of results to be achieved—a criterion which Dr. Schrader, one of the defendant's experts, expressly adopted and a criterion which Dr. Grondal, another one of the defendant's experts, in effect, adopted.

At page 2, column 2, lines 10 et seq., Deskey again speaks of:

"* * * parallel grooves of irregular or random depth, comparing one groove with another."

Here, again, the feature of random depth is reiterated and re-emphasized.

At page 2, column 2, lines 30 to 40, Deskey recognizes that some small edge separation, checking or cracking might occur, notwithstanding his product, and as to such occurrences, i. e., edge separa-

tion and checking, Deskey says that the grooving would render the edge separation "virtually unnoticeable" and would "effectively conceal" the checking. This bears on the matter of esthetics.

Both Dr. Schrader and Mr. Martin, defendant's witnesses, admitted that, so far as they were concerned, the primary problem presented by checking was one of bad appearance.

So much for the specification. Of course, the claims cannot broaden that which is not contained in the specification, and therefore it is important to emphasize the infirmities, defects and inadequacies of the specification.

■ The cases teach us that, in interpreting a patent, it should be read like other legal documents, in an effort to impart a rational and common sense, understandable meaning to all of the words and phrases. The Courts have criticized those who would, by dialectical subtlety and casuistical analysis, emasculate words of their meaning. For such reason, this Court has attempted to so read the Deskey patent as to extract from it as much guidance, direction and information as might sustain the validity of the patent.

■ This Court has endeavored to read the Deskey patent liberally, having in mind that patents are not written by grammarians or by literary purists. Some writers of patent applications seem to have a patois or jargon all of their own. It is only realistic in reading patents to recognize the conventions and patterns of language and clichés that are characteristic of this genre of legal composition.

In spite of every effort to salvage the patent by giving it the broadest intendment and the most liberal interpretation and construction, this Court must confess that it has been forced reluctantly to the conclusion that the patent is fatally defective, obscure in its vital respects, hazy where there should be certitude, and amorphous where there should be lines of demarcation between that which is legitimate and that which is illegitimate.

The Court has been unable to penetrate the cloud of adjectives and adverbs which are so juxtaposed as to yield meaning only in terms of function and results. The claims, no less than the specification, are subject to the same criticism.

Claim 1 reads, for example, as follows, so far as relevant to the legal issue under consideration:

"1. *. * * the exposed surface of said face ply having a plurality of substantially continuous grooves of random depth over the surfaces, but each groove being of the same depth throughout its length, frequent grooves being of material depth to pass through any hard growth layer encountered, said grooves extending substantially lengthwise of the grain in said ply, and generally across its width, and being sufficiently closely spaced to localize within the individual ribs or groups of ribs the normal stresses arising from shrinking, expanding and the like, and to prevent accumulation of such stresses across any appreciable width of the ply, and also to largely destroy the normal grained effect."

This is substantially the same language as has been previously noted in regard to page 1, column 1, lines 49 et seq. It would unduly prolong the length of this opinion to go through the detailed analysis previously made of page 1, column 1, yet, because of the grave consequences flowing from the indefiniteness, the Court feels it necessary to point out the following:

"a plurality of substantially continuous grooves of random depth"—There is no specification or definition of any of these words.

"frequent grooves being of material depth"—There is no specification or definition of what is "frequent" and what is "material".

"material depth to pass through any hard growth layer encountered"—This describes depth in terms of some other vague concept in view of the fact that

hard growth layers may be encountered anywhere from the surface of the face ply down to the glue line.

"generally across its width"—This gives no informative data.

"being sufficiently closely spaced"—This gives no specification or definition or delineation.

"closely spaced to localize * * * the normal stresses * * * and to prevent an accumulation of such stresses across any appreciable width of the ply and also to largely destroy the normal grained effect"—This is a description in terms of results. Moreover, the word "appreciable" is uninformative.

There is similar language in claims 3, 5 and 7, e.g., "multiplicity of grooves," "grooves being each sufficiently deep to prevent stresses," "appreciable width," "random depth relatively to other grooves," "each groove being relatively narrow," "closely adjacent other grooves," "width not appreciably exceeding its depth," "being of sufficient frequency and narrowness and sufficiently closely spaced across the panel to localize stresses."

Claims 2 and 4 are interdependent as claim 4 is expressly conditioned upon claim 2. Claim 2 has such words as the following:

"a multiplicity of grooves," "frequent grooves," "substantial average depth relatively to the thickness of said face ply," "each groove being relatively narrow," "closely adjacent other grooves," "the depth of said frequent grooves and their frequency being such as to prevent stresses," "appreciable width."

This Court will discuss the question whether claim 2 requires random depth when the subject of infringement is discussed in this decision.

It is abundantly clear from the testimony—even according to the defendant's own experts, which of course is confirmed by the testimony of the plaintiff's witness—that the specification and claims of the Deskey patent do not set up any specific or definite, measurable criteria or standards. The cross-examination of Dr.

Schrader and Dr. Grondal convincingly establishes that they were unable to explain satisfactorily the metes and bounds of the Deskey invention. In their endeavor to sustain the defendant's position, they were driven from one adjective and adverb to another, in a circular chase for meaning, which resulted in no definition except in terms of the original terms sought to be elucidated. Function and result turned out to be the sole criteria. Indeed, in the comparative analysis of all of the grooved shakes and shingles and the Moray plywood, it developed that the differences were only of degree and not in kind. And the defendant's own witnesses, however reluctantly they yielded on the point, finally conceded that what was involved was a matter of degree.

The testimony of Dr. Schrader on this point is particularly significant, bearing in mind that he was one of the defendant's own experts and an employee of the defendant.

Thus, at page 911 of the trial record, he testified as follows:

"Q. Well now, based upon everything you have done up to this moment are you able to define those boundaries for me or would it require further study? A. I could not define them precisely, your Honor.

"Q. It would require further study? A. I think it would require a tremendous amount of study to fix this minimum width. I could give you my version as an opinion."

At page 916, Dr. Schrader testified as follows:

"Q. Now is there anything in the Deskey patent which attempts to formulate the critical limits, the minimum and maximum or the minima and the maxima within which if you do that you come within Deskey and if you go outside of the minimum in one direction or outside the maximum in the other direction you are outside Deskey?

"A. Not to the extent that I could put my finger on it and say it is X number."

Both Dr. Schrader and Dr. Grondal in effect testified that you have to work back from results, using a microscope to find out what Deskey meant.

At pages 917 to 918, Dr. Schrader testified as follows:

"Q. And is it your opinion that the novelty of theory, design and technique embodied in Deskey consists of a combination of all of these elements? A. Yes, sir.

"Q. And these elements are variable? A. Yes, sir. He speaks of 'preferably' in some cases to show his recognition of variables.

"Q. Each of the five elements are variable or are they not, or one is not, the one that the grooves run longitudinal has to be uniform, that's not variable? A. No, sir.

"Q. Are the others variable? A. I believe so.

"Q. Well then, according to the theory of permutations and combinations, which you are familiar with—A. Yes, sir.

"Q. —you couldn't tell offhand how many design patterns would or would not come within the teaching of Deskey, or could you? A. I don't think it would be possible."

No practical purpose would be served, within the confines of this opinion, to winnow through all of Dr. Schrader's testimony and to point out the details which support the views expressed by the Court.

Dr. Schrader, at one point in his testimony, attempted to assume that the Figs. 1 and 2 of the Deskey patent were drawn to scale, using the stud as the key measuring standard. Upon further examination, it appeared that his was an erroneous premise, for the studs vary from 1%16 inches to 2 inches; secondly, the Figs. 1 and 2 are not intended to be accurate drawings but merely diagrammatic and illustrative; third, the stud in the Deskey patent is merely illustrative of a support; fourth, the stud in Fig. 1 is smaller and the plywood in the Fig. 1 is larger than in real life. It was defi-

nitely established that the use of the stud scale as a measuring device is inaccurate.

Moreover, he admitted that Weldtex is not precisely like the Deskey patent drawing; and the Bailey patent drawings use different scale drawings from Deskey.

In comparing the Moray plywood with the Combwood that was involved in the California litigation, it developed that the distinguishing feature, according to Dr. Schrader, was the depth of grooving. For example, the grooving in the Moray plywood was said to be approximately 14 per cent of the depth of the face ply, whereas in Combwood the depth of the grooving was said to be approximately one-third of the depth of the face ply. This dramatically illustrates the thesis that the differences involved are differences in degree.

Dr. Grondal's testimony demonstrated that Moray plywood grooves went approximately 20 per cent through the face ply, whereas the Combwood groovings went through approximately 57 per cent of the face ply and that the only real difference between Moray and Combwood was the difference in the depths of the grooves so far as Dr. Grondal was concerned—that is, the Combwood grooves in the face ply were deeper than the grooves in Moray. There were other differences to be sure, because Combwood used compression and embossing instead of gouging. Yet, it is to be observed that, in spite of those differences, the Court in the Zeesman case held Combwood to infringe Deskey. Hence, to that extent, there is judicial recognition that the difference between compression and embossing, on the one hand, and gouging, on the other hand, was not deemed to be significant.

It thus appears from Dr. Grondal's testimony, together with all of the other testimony in the case, that if Combwood is an infringing product—which is what the Court held in the Zeesman litigation—it would have anticipated Deskey if it had been made before Deskey's patent.

And, by a parity of reasoning, Moray plywood, as already found by the Court, anticipates Deskey, as does the grooved lumber whose grooves, if made in plywood, would go one-half way through the face ply. But the point that the Court emphasizes is that, according to defendant's own witnesses, the depth of the grooves was the critical variant; and, at this vital point of alleged novelty and invention, the variant is left unspecified, unmeasured, undefined and in a zone of uncertainty.

The defendant's witnesses involve themselves in self-contradictions because they ultimately selected one or two features of Deskey as the controlling elements. Dr. Schrader said the result was the determining factor whereas Dr. Grondal said the important feature was the depth. When questioned about the interpretation of the Deskey patent, they nevertheless referred to various other characteristics as being important, such as, the width of the grooves, the height of the ridges, the spacing *inter se* of the grooves and the ridges, and the closeness of the grooves to the edges of the panel. On the one hand, they took the position that the Deskey result was achieved through a combination of characteristics and features. This conflicted with their view that there were one or two critical aspects which were controlling. This shifting of testimony added to the confusion engendered by the language of the Deskey patent itself.

Dr. Schrader and Dr. Grondal have devoted a good part of their lives to a study of this problem and are intimately familiar with the Deskey patent—in the case of Dr. Grondal, from the moment of its birth. Nevertheless, they were unable to give any satisfactory exposition of the meaning of the Deskey patent. How can the Court expect others, whether members of the general public or persons of ordinary skill in the art, to understand the Deskey patent? The answer is obvious. The Deskey patent just does not make sense so far as patent law and the requirements of the patent law are concerned.

Dr. Grondal repeatedly insisted that random depth was the crucial element. He predicated his view upon the fact that the critical aspect of Deskey was achieved by random depth, which he said was at least one-fourth of the thickness of the face ply. This, of course, ignores such elements as the multiplicity of the grooves, the spacing of the grooves, and all of the other characteristics described in the Deskey patent. Dr. Grondal took the position that the grooves must go down at least one-fourth of the thickness of the face ply to be effective and that, therefore, infringement of Deskey begins when the grooves go down one-fourth of the face ply's thickness and not before. To him one-fourth depth of the face ply is the critical depth. He said, grooves going down one-fourth of the thickness of the face ply would eliminate 20 per cent of checking; that grooves going down one-half of the thickness of the face ply would eliminate 70 per cent of the checking; and that the maximum of limitation achieved by deep grooving is 90 per cent of checking.

I emphasize, that according to Dr. Grondal, in considering the question of what infringed Deskey, the important thing was solely the deepness or penetration of the depth, and not its random character.

We then have the following testimony from Dr. Grondal: that grooves penetrating 18 or 19 per cent of the depth of the face ply would not infringe Deskey but that if they penetrated 25 per cent of the face ply they would infringe Deskey.

The above interpretation of Dr. Grondal finds no corresponding basis, of an objective character, in the specification.

Finally, with reference to Dr. Grondal, we have his testimony (trial record, at pages 1606 to 1610) admitting that it would be possible by using a micrometer (which is readily available) to measure the physical characteristics of the Deskey plywood to the extent of measuring every groove,—which could be expressed in millimeters or centimeters or fractions of inches; and that the use of a caliper micrometer is common.

Dr. Grondal also admitted that the depths required to produce the Deskey result would vary—with the kind of tree, with the thickness of the face ply, with the species of wood from tree to tree, with the use of the plywood, with the manufacture of the plywood, and to a minor degree with the kind of glue.

The concluding questions and answers in his testimony are as follows: (SMP 1610)

"Q. As a matter of fact, the statement that you need grooves going down ¼ of the thickness of the face ply is simply an approximation of averages? A. That is true.

"Q. And it is not a hard and fast rule? A. It is not.

"Q. It is a loose rule? A. Yes, your Honor."

Before we leave the subject of Dr. Grondal's testimony, it should also be observed that with regard to the tests he conducted originally in 1941—concerning the checking of the face ply of plywood and the comparison between grooved and ungrooved surfaces—Dr. Grondal testified that he had carried on a large number of tests during this three or four months period when he was engaged in the research, but that he had not taken a single photograph of any of the resulting checks discussed in the third item of his report "Elimination of checking and cracking." (See Defendant's Exhibit T, page 21.) Although he had taken photographs of the results with regard to the edge-separation aspect of the research, he took no photographs with regard to the elimination-of-checking project contained in his research. He explained that he had not done so because he did not have the time. As a result, the Patent Office, which presumably relied on his report, had no corroborating photographs on the subject of the elimination of checking and cracking, that is, the third branch of the research undertaken by Dr. Grondal.

It thus appears that, even if we were to give the defendant every benefit of the doubt by stating arguendo that Deskey had discovered something new which had not been anticipated, the specification and claims fail to comply with the requirements of the patent law that the description of an invention contained in the specification shall be in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same. This is the provision of the Patent Act of 1952, U.S.Code, Title 35, Section 112, and it was substantially the same in former Section 33 of U.S.Code, Title 35, the predecessor provision of Section 112.

Assuming that Deskey discovered that at some depth penetration a totally unexpected and novel result was achieved, the point of discovery has not been located, defined or specified. This is of critical importance because, admittedly, grooving *qua* grooving has a long history in woodworking, and the basic distinction between Deskey and the prior art, according to the defendant's thesis, is expressed in the statement that this old technique of grooving was utilized as the basis of a new discovery because—by changing the depth (confining ourselves for the moment only to the aspect of depth)—a startling and novel result was achieved. If one considers that the Deskey patent itself has many other allegedly essential attributes, i. e., the width of the grooves, the width of the ridges, the height of the ridges, the spacing of the grooves, the frequency of the grooves, et cetera, (see Deskey patent)—none of which is defined—it is an intellectual impossibility to determine the critical points or critical limits that were allegedly discovered by Deskey.

In order that the public may definitely and precisely understand its rights and be warned as to what is forbidden to it, the patent laws and the judicial decisions construing those laws have long provided that the claims of a patent shall particularly point out and distinctly claim the subject matter which the applicant regards as his invention.

The Court believes that the foregoing analysis shows that both the specification and claims of Deskey fail utterly to com-

ply with these long-standing requirements. Neither Deskey's specification nor his claims comply with the requirements of the statute; and the patent is invalid for that reason.

The law in this field is well settled. In the leading case of General Electric Co. v. Wabash Appliance Corp., 1938, 304 U. S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, where the Supreme Court held void a patent covering a filament for electrical incandescent lamps for want of a sufficiently definite disclosure, the Court said that it would assume that the inventor (Pacz) had sufficiently informed those skilled in the art how to make and use his filament. But, declared the Court, the statute has another command: the applicant must comply accurately and precisely with the statutory requirements as to claims of invention and discovery by making a distinct and specific statement of what he claims to be new and to be his invention. The limits of the patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against uncertainty as to the rights of the patentee and others. The limits of the patent monopoly must be stated and, in a limited field, the variant must be clearly defined.

In that case, as in the present case, the claim used functional language at the exact point of novelty. At pages 371–372 of 304 U.S., at page 903 of 58 S.Ct. the Court said:

> "A limited use of terms of effect or result, which accurately define the essential qualities of a product to one skilled in the art, may in some instances be permissible and even desirable, but a characteristic essential to novelty may not be distinguished from the old art solely by its tendency to remedy the problems in the art met by the patent."

In United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232, Mr. Justice Jackson, writing for a unanimous Court, held that the claims in litigation there were bad for indefiniteness.

United Carbon and General Electric are the two leading cases in this field; they have been followed by cases that are legion in number.

At pages 231 to 236 of 317 U.S., at pages 167 to 169 of 63 S.Ct. of the United Carbon case, the Court analyzed the product claims there, and, after doing so, Mr. Justice Jackson concluded that it was difficult even for persons skilled in the art to measure the inclusions or to appreciate the distinctions which may exist in the words of the claim when read in the context of the art itself. There, as in the case at bar, the Court considered the testimony given on the trial which sought to explain the significance that the terms employed in the claim had for those skilled in the art, such as, "substantially pure," "commercially uniform," "comparatively small," concerning which the Court pointed out that nowhere was there testimony as to the standard intended for comparison. The expression " 'approximately one-sixteenth of an inch in diameter,' " which apparently gave some certainty of dimension, disappeared in that case when it was testified that the quoted expression "includes a variation from approximately ¼th to ¹⁄₁₀₀th of an inch." [317 U.S. 228, 63 S.Ct. 168.]

The principles laid down by the General Electric and the United Carbon cases are that the Courts must insist upon the precision enjoined by the statute; that claims of a patent which are inaccurate suggestions of the functions of the product fall afoul of the rule that a patentee may not broaden his claims by describing the product in terms of function; and that, even if claims are read in the light of the patent specification there, as in the case at bar, the conclusion was not changed because the description in the specification is itself almost entirely in terms of function and hence the specification in the cited cases, as in the case at bar, did not have any curative effect.

At page 236 of 317 U.S., at page 170 of 63 S.Ct. of the United Carbon case, the Court said that the statutory requirement of particularity and distinctness in claims is met "only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clear-cut to enable courts to determine whether novelty and invention are genuine."

Finally, at page 237 of 317 U.S., at page 170 of 63 S.Ct. of the United Carbon case, the Court summarized its position by stating:

"An invention must be capable of accurate definition, and it must be accurately defined, to be patentable."

Similar holdings appear in the following cases, which this Court cites merely as being typical: B. B. Chemical Co. v. Cataract Chemical Co., 2 Cir., 1941, 122 F.2d 526, 529–531; American Type Founders v. Dexter Folder Co., D.C.S.D. N.Y.1946, 71 F.Supp. 712, 721, affirmed on the District Court's opinion in 2 Cir., 1947, 164 F.2d 118; Van Der Horst Corp. of America v. Chromium Corp., D.C.S.D. N.Y.1951, 98 F.Supp. 412, affirmed 2 Cir., 1952, 197 F.2d 791; Philip A. Hunt Co. v. Mallinckrodt Chemical Works, 2 Cir., 1949, 177 F.2d 583, 584–586.

One of the most recent cases handed down in this circuit is Helene Curtis Industries, Inc., v. Sales Affiliates, Inc., 2 Cir., 1956, 233 F.2d 148. There Circuit Judge Hincks, in a landmark decision, discussed the questions of lack of invention and indefiniteness; and he quoted, at page 152, the analysis of former District Judge Rifkind, the Master in that case, who had said:

" 'Thus, as has frequently been said, the mere location of the optimum conditions of use for a known composition of matter does not constitute "invention" so as to entitle the discoverer thereof to a monopoly.' "

In that case a much greater degree of precision was presented than in the present case, and yet "the claims were void for indefiniteness" at page 159. At page 160, the Court said:

" * * * the requirement of the Act for definiteness in the statement of claims must be strictly construed." And the Court concluded, at page 160, that the claims there in suit were invalid "for indefiniteness", among other reasons.

Many more cases could be cited in substantiation of the same point, but it would serve no purpose to reiterate what has now become fundamental in patent law.

We now come to the issue of infringement.

19. In my opinion, the Deskey patent describes only a panel having grooves of unequal or random depth. Figs. 1 and 2 illustrate only such grooves; and other language in the patent which refers to unequal or random depth has already been referred to in the course of this opinion.

I find that the Deskey claims are limited to such a structure. Claims 1, 3, 5, 6, 7 are explicitly so limited. I find that in claims 2 and 4 the limitation is implicit.

Claim 2 calls for "frequent grooves being of substantial average depth." In contrast with this language relating to depth, claim 2 requires that *"each* groove" be "relatively *narrow"* and that *"all* of *such* grooves" extend longitudinally in the direction of the grain. The words "each groove" are to be equated in their totality with the words "all of such grooves." Both of these expressions thus apply to every groove in the panel, describing the *width* and the *length* of each groove.

In contradistinction to these expressions relating to all grooves or every groove, the words *"frequent* grooves" and their *depth* must refer to a lesser num-

ber, that is, a number less than all of the grooves. This construction is essential in order to give a consistent and logical meaning to all of the words used. Therefore, the grooves not included within the description of the frequent grooves of substantial average depth would have a depth other than substantial average depth. Hence the grooves would be of varying or random depth. This view is consistent with the file history of the application. (See Defendant's Exhibit T.) Original claim 13 expressly required, as did the other claims, that its grooves be of random depth, and it was allowed with these words included. *Thereafter,* and under Patent Office Rule 78, 35 U.S.C.A.Appendix, the words "random depth" were eliminated. (See Defendant's Exhibit T, page 84.)

■ It is this Court's view that Rule 78 was intended to provide only for formal amendments and not to be used as a means of broadening the essential coverage of a claim. The elimination of the words "random depth" therefore removed superfluous words, the original intent of which was nevertheless preserved and expressed in the other words of that claim, and which are illustrated in the two figures contained in the patent drawing.

The plaintiff's striated plywood does not have grooves of random depth. All are of precisely the same depth. There are other differences between plaintiff's product and defendant's Weldtex. Accordingly, none of the claims of Deskey is infringed by plaintiff's striated plywood.

20. Defendant has admitted that no claim of either Bailey patent is infringed by plaintiff's striated plywood. That there is no infringement of the Bailey

claims is also self-evident from an examination of those claims. Bailey No. 2,-363,492 (process) contains five claims, all of which require the use of face and rear plies of different thickness prior to grooving. Bailey No. 2,363,927 (product) has four claims, each of which claims is similarly limited.

The plaintiff's striated plywood employs face and rear plies which are of the same thickness. Therefore, there is no infringement of the Bailey claims.

Defendant's counterclaim, based upon plaintiff's alleged infringement, must be and hereby is dismissed.

21. Defendant's conduct with respect to its licensees has not gone beyond what is legitimately allowable. Had defendant's patents been valid, defendant would not have been disqualified or disentitled to enforce such patents. The decision herein against the defendant is based upon the substantive merits of plaintiff's position as sustained by the evidence and not upon any disqualification of defendant based upon alleged misuse of defendant's patents. The defendant has not been guilty of violating any of the anti-trust laws and none of the arrangements or agreements by and between the defendant and its contractors in regard to the licensing of the Deskey patent or in regard to contracts concerning the Deskey patent violates the anti-trust laws.

The Court has examined all of the cases cited by counsel for both sides on the general subject of when a patentee may be disqualified from enforcing the patent monopoly by virtue of misconduct. These cases are cited in the margin of this opinion.[1]

The Court finds that there is no credible evidence of a persuasive character

1. Automatic Radio Mfg. Co. v. Hazeltine Research, 1950, 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312; Katzinger Co. v. Chicago Metallic Mfg. Co., 1947, 329 U.S. 394, 400–401, 67 S.Ct. 416, 91 L.Ed. 374; American Tobacco Co. v. United States, 1946, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575; Scott Paper Co. v. Marcalus Mfg. Co., 1945, 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47; Nachman Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 1943, 139 F.2d 781, 783–787; Bucky v. Sebo, 2 Cir., 1953, 208 F.2d 304, 305–306; Becton, Dickinson & Co. v. Eisele & Co., 6 Cir., 1936, 86 F.2d 267, 269; United States v. Standard Oil Co., D.C. N.D.Ill.1929, 33 F.2d 617, 630; United States v. Timken Roller Bearing Co., D.C.N.D.Ohio 1949, 83 F.Supp. 284, 307; United States v. Imperial Chemical Industries, D.C.S.D.N.Y.1952, 105 F.Supp. 215, 221.

in this case to demonstrate that the defendant has violated any of the statutory provisions as judicially construed.

22. Coming to the question of unfair competition, the Court has already pointed out that Deskey himself disavowed and disclaimed a recurring pattern. Indeed, he attempted to distinguish between his patent and the prior art which contained patterned grooving (see Deskey patent, page 1, column 1, line 55; page 2, column 1, line 10; page 2, column 1, line 23).

Upon a careful consideration of the evidence the Court has concluded and finds that the defendant's assertion of unfair competition by the plaintiff is without merit. There is no credible evidence of a convincing character in this case establishing that the alleged design of the grooving on the face of defendant's Weldtex has come to mean anything to anyone. In fact, the evidence given by deposition and stipulation indicates that there is no secondary meaning.

In recognition of the fact that any grooved wood product will bear some resemblance to any other grooved wood product (as is shown, for example, by the similarity between the prior art grooved shakes, grooved lumber, Moray plywood and all other grooved products in this case), plaintiff's grooved plywood has been made to distinguish it, as far as it reasonably can, from the alleged pattern employed by defendant in its Weldtex. The plaintiff's panels show, in fact, a differing design. They are made of equal thickness plies, whereas defendant's Weldtex is made of plies of unequal thickness.

Both plaintiff and defendant adequately identify their product by repeated stencilings of their names on the back of each panel. Defendant's Weldtex has a smooth back. Plaintiff's striated panels have slotted backs. There has been no credible or convincing evidence of palming off chargeable to the plaintiff. Plaintiff is not guilty of unfair competition, and defendant's counterclaim based upon plaintiff's alleged unfair competition must be and hereby is dismissed.

In connection with the charge of unfair competition and the matter of pattern, it may be observed that the parallel multiple grooves on the face of Weldtex may hardly be said to constitute a "pattern" in the special sense of a decorative design or stylistic type having a distinctive personality or individual uniqueness. Weldtex, as well as other grooved products, does have highly decorative value. Indeed, the Court has found that it is the chief value for interior use and especially non-industrial use. But such pattern as Weldtex may have arises out of the fact that there are recurring striations or grooves; and it is a characteristic which inevitably results when any wood product is grooved over an extended area by means of parallel grooves.

There is some evidence that the defendant does have other grooved plywood products also sold under the general trade-mark of "Weldwood" which seemed to have more originality of design. Upon a consideration of the entire record, the Court concludes that Weldtex may be analogized to such other building materials as sand and bricks.

23. I come now to the California litigation upon which the defendant places great reliance. Of course, any decision by another federal court adjudicating the validity of a patent is entitled to respectful consideration; such a decision has a highly persuasive character.

Nothing that is said in this opinion detracts in the slightest from the correctness of the decision rendered by my distinguished and learned colleague, Judge Hall. Judge Hall did not hold a full plenary hearing on the merits. All that was before Judge Hall were motions for preliminary injunction. It requires no more than passing comment to point out that there is a world of difference between an adjudication on a motion for a preliminary injunction and a decision rendered after a two-weeks' trial on the merits,—a trial where witnesses have appeared on the stand and have been cross examined, and where all of the evidence has been thoroughly scrutinized, analyzed and investigated

870

in open court. This decision, therefore, in no way derogates from the decision of Judge Hall. There simply is no basis for genuine comparison between the two decisions.

However, in order to satisfy itself, this Court has carefully read all of the material available, within the compass of this trial, bearing on the California or Zeesman litigation, as it has been referred to. If the California litigation has any significance it tends to support the plaintiff and not the defendant in this case. (See supra, 148 F.Supp. at page 854, for this Court's discussion of the Combwood, Zeetex and Venetex products which were held to be infringing articles in the California litigation.)

Judge Hall meticulously pointed out in both of his decisions, and the consent decree expressly states, that the holding therein was limited to the motion and to the parties-litigant in that case. For example, the phrase "for the purposes of this motion" appears in the findings of Judge Hall; and it is apparent that he relied to a great extent on the presumption of validity arising out of the issuance of the Deskey patent. The conclusions of law of Judge Hall indicate that, for purposes of a preliminary injunction, the presumptions based upon long trade acquiescence, commercial success, and the issuance of the patent had not been rebutted. The consent decree expressly is limited to the parties.

I feel fairly sure that, if Judge Hall had had the opportunity of going into the merits of the matter as this Court has had, he would have reached the same result as this Court has reached.

I have considered the prior art cited in the California Zeesman litigation as I have considered the prior art considered by the Patent Office. It is clear beyond possibility of contradiction that neither the Patent Office nor the California court had the opportunity which this Court has had of making the minute and meticulous examination of the prior art which has been made in this case and which is amply demonstrated by the record of the proceedings here.

■■■ It is generally stated and recognized that the issuance of a patent creates a presumption of its validity. But the cases are many where the courts have not hesitated to declare invalidity in the light of evidence demonstrating error on the part of the Patent Office; and an examination of such cases has indicated that the evidence required to rebut the presumption was not altogether overwhelming.

As typical of the cases in this field of the subject, this Court cites the cases set forth in the margin to this opinion.[2]

24. I now take up the question of commercial success of the defendant's Weldtex.

■■■ In case after case in this circuit it has been pointed out that, while commercial success may tip the scales on the issue of invention, where the case is a close one, it does not follow from commercial success per se that the patent is valid. A typical expression of very recent date on the subject is contained in Application of Patton, Cust. & Pat.App.1956, 234 F.2d 499, at page 503, where the Court said:

"However, it is well settled that evidence of commercial success may be controlling only where the issue of patentability is otherwise doubtful [citing cases]. In the present

2. Paramount Industries v. Solar Products Corp., 2 Cir., 1951, 186 F.2d 999; Wabash Corp. v. Ross Electric Corp., 2 Cir., 1951, 187 F.2d 577, 590, certiorari denied 1951, 342 U.S. 820, 72 S.Ct. 38; 96 L.Ed. 620; Hunt Co. v. Mallinckrodt Chemical Works, D.C.E.D.N.Y. 1947, 72 F.Supp. 865, 869, affirmed 2 Cir., 1949, 177 F.2d 583; Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 1942, 130 F.2d 290, 294; Cornell v. Chase Brass & Copper Co., D.C.S.D.N.Y.1943, 48 F. Supp. 979, affirmed 2 Cir., 1944, 142 F. 2d 157; Picard v. United Aircraft Corp., 2 Cir., 1942, 128 F.2d 632, 641, certiorari denied 1942, 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524; Ginsberg v. Railway Express Agency, D.C.S.D.N.Y.1947, 72 F.Supp. 43, 44.

case we have no doubt that invention is lacking. Therefore, the arguments relative to commercial success are not persuasive."

In the leading case of Hazeltine Corporation v. Abrams, 2 Cir., 1935, 79 F.2d 329, 331, Judge Learned Hand said that the test of success in that case, considered in the light of the entire record, was "such as to make the evidence impressive."

Judge Hand considered all of the trade factors that explained the success as due to something other than novelty.

In the recent case of Wilson Athletic Goods Manufacturing Co., Inc., v. Kennedy Sporting Goods Manufacturing Co., Inc., 2 Cir., 1956, 233 F.2d 280, 284, Circuit Judge Hincks said (citing many cases) that it was "not a case in which evidence of commercial success tips the balance on the issue of invention."

Similarly, in Welsh Manufacturing Company v. Sunware Products Co., 2 Cir., 1956, 236 F.2d 225, Judge Lumbard said, at pages 227–228, that commercial success, in the case there under consideration, would not "tip the scales in favor of invention," citing cases.

So, too, in Magnus Harmonica Corp. v. Lapin Products, Inc., 2 Cir., 1956, 236 F.2d 285, Judge Lumbard's analysis indicated at page 287, that, in determining the probative value of the inferences flowing from commercial success, it is necessary to determine all of the facts and circumstances surrounding and explaining the success.

I do not believe that the commercial success of the defendant's product in this case establishes a sufficiently strong presumption of validity to withstand the clear and convincing evidence of invalidity.

■ 25. The defendant has argued that long and widespread acquiescence of the industry, which now includes about 110 plywood manufacturers in the United States, supports a strong inference that the defendant's patents are valid. The defendant argues that long acceptance and acquiescence in those patents and the widespread recognition of those patents creates a strong inference that the patents are valid.

Whatever inference may flow logically from the foregoing facts has been rebutted and overcome by the clear and convincing evidence to the contrary.

Defendant argues that the acquiescence of Melby, who made the Moray plywood, is of particular importance.

This Court has read the deposition of Melby and, from it, would appear that Melby had been informed by one Devlin connected with the Trade Association that if he manufactured Moray plywood he would be sued for infringement by the defendant.

The particular Devlin letter involved was not marked for identification or put into the record of the deposition and is not, therefore, available to the Court; and this Court does not make a finding that, in fact, the defendant threatened Melby with infringement litigation if he manufactured Moray plywood. But regardless of the fact that the Devlin statement or letter is not an admission binding on the defendant, it is nevertheless competent to prove the state of mind of Melby; and it thus serves to explain why Melby did not resume manufacturing Moray plywood.

On the question of acquiescence of the trade in the patents owned by a powerful figure in the industry, it is pertinent to quote the words of Circuit Judge Frank, concurring, in Picard v. United Aircraft Corporation, 2 Cir., 1942, 128 F.2d 632, at page 641:

"The Patent Office grants from 50,000 to 100,000 patents each year. The Committee of the Science Advisory Board reported that it was one of the primary defects in our patent system that the Patent Office issues 'an enormous number of patents, many of which should never be issued * * *'. That probably means, as the Committee intimated, that the standard of inventiveness employed by the Patent Office is far below that employed by the

courts. Yet most patents escape judicial scrutiny, since few patents ever get into court. For the expense of defending a patent suit is often staggering to the small businessman. And there is reason to believe that, unable, for that reason, to defend a threatened patent suit, many persons capitulate to a well financed patentee without litigating; the result is that many patents, which are 'spurious'—i.e., would probably not stand up in court, if contested —confer, in actual fact, patent monopolies which are as effective, for all practical purposes, as if they had been judicially held valid. The actual enjoyment of a patent monopoly— which, of course, has its effect on the public—may, it seems, often depend on the fact that the patent is owned by a wealthy concern and that alleged infringers lack funds to defend themselves. But the exploitation of such a monopoly should not turn on such fortuitous circumstances."

This Court cannot make a finding as to just why other plywood manufacturers did not attempt to litigate the validity of the defendant's patents. The Court may take judicial notice of the possible circumstance that plywood manufacturers other than plaintiff may not have undertaken the intensive investigation, both legal and factual, under competent auspices, necessary to resolve the many questions that are involved in the successful conduct of such a contest.

Businessmen do not relish the prospect of expensive and protracted litigation. The cost of taking of depositions throughout the length and breadth of the land, the antagonizing of customers, the publicity involved, the uncertainties of the outcome are many other practical factors inherent in all such litigation.

Certainly the presumption flowing from acquiescence in the defendant's patent is not so strong that it should be dispositive and decisive of the issues herein in the face of the clear and convincing evidence to the contrary.

I now come to the conclusions of law.

■■■ 1. Deskey patent No. 2,286,068 is invalid and void.

2. Bailey patent No. 2,363,492 is invalid and void.

3. Bailey patent No. 2,363,927 is invalid and void.

4. Both of the defendant's counterclaims are dismissed on the merits.

5. Plaintiff shall recover from defendant its ordinary costs in this action to be taxed against defendant by the Clerk of this Court.

Counsel may submit such additional and supplementary findings of fact and conclusions of law as they may deem necessary and appropriate, consistent with this decision, to effectuate the holdings of the Court. Such additional findings of fact and conclusions of law are to be submitted on five days' notice. Settle form of judgment on five days' notice.